BRIDGET TIMLAN AND PATRICK TIMLAN, DEFENDANTS IN ERROR. v. JOHN DILLWORTH, PLAINTIFF IN ERROR.

Argued February 20, 1907—Decided June 10, 1907.

In a suit to recover damages by a husband and wife against the owner of an apartment house, in which they were tenants, for injuries sustained by the wife through the fall of a dumb-waiter elevator, which ran in a shaft between the apartments from the upper floor to the cellar, for the convenience of the tenants, eight in number, it appeared that the elevator was operated by hand on a system known as the wheel and axle, with a counterpoise; that as the wife took hold of the down-haul rope through the door from the kitchen, in order to lower the car, which was at the top of the shaft, it fell, because of the dropping of the nut or bur from the end of the ring-bolt in the head of the car, which held it in position, striking her upon the head. The nut was afterwards found in the bottom of the car with but one bright thread in it, and

upon the bolt, the other threads showing rust and disuse, and the nut was found to fit loosely upon the bolt. At the trial motions were made for a nonsuit and for the direction of a verdict, which were denied. It was *held*, on review—

(1) That the dumb-waiter was one of the common facilities retained by the landlord, who thereby was charged with the exercise of reasonable care concerning its condition, under the rule laid down in *Siggins* v. *McGill*, 43 *Vroom* 263.

(2) That although the wife, in accounting for her head being struck, testified that the force of the rope dragged her into the shaft, the facts did not show, at least conclusively, that she was guilty of contributory negligence, which was urged on the ground that it was a physical impossibility that she should be drawn into the shaft in that way, it also appearing that there was evidence tending to show that when the counterpoise fell, as it did upon the falling of the car, that would go down with a run, occasioning friction of the up-haul rope on the small wheel, and the resulting rotation would have a tendency to lift the rope of which the wife had hold.

(3) The exception taken to the charge that the loss of the comfort and society of the wife might be considered as an element of damage in the husband's favor was multifarious and nugatory, because it embraced several distinct matters, without pointing out to the court the precise question complained of, which was, as it now appears, that there was no averment in the declaration that would cover the items of damage alluded to.

(4) That the judgment below must be affirmed.

On error to Hudson Circuit Court.

Before Justices FORT, HENDRICKSON and PITNEY.

For the plaintiff in error, *John W. Queen* and *Gilbert Collins.*

For the defendants in error, *William H. Speer.*

The opinion of the court was delivered by

HENDRICKSON, J.   This writ brings up for review a judgment of the Hudson County Circuit Court entered upon the verdict of a jury.

The plaintiffs, who are husband and wife, recovered a verdict in favor of Mrs. Timlan for $2,000 and of Mr. Timlan for $500 damages, and the plaintiffs having elected to remit

excessive damages pursuant to the opinion of the trial court upon a motion for a new trial, judgment was entered in favor of Mrs. Timlan for $1,400 and in favor of Mr. Timlan for $300 damages.

The errors assigned grow out of the refusal of the trial judge to grant a nonsuit and to direct a verdict for the defendant upon which exceptions were allowed and sealed and also upon exceptions to the charge.

The action arose out of injuries sustained by Mrs. Timlan through the falling of a dumb-waiter elevator in premises owned by the defendant situate in Jersey City, and a part of which were occupied by the plaintiffs as tenants. There were eight tenants occupying different apartments. The dumb-waiter ran in a shaft between the apartments from the upper floor to the cellar, and was used by all the tenants for the purpose of carrying coal and wood from the cellar and lowering ashes to the cellar. Doors opened from the dumb-waiter shaft to the apartments. The dumb-waiter was twenty inches deep, twenty-four inches wide and three feet seven inches high, weighing from fifty to seventy-five pounds. It was operated by hand on a system known as the wheel and axle. At the top of the shaft was a platform upon which was a revolving shaft carrying a large pulley thirty inches in diameter and a small pulley ten inches in diameter, the smaller pulley being known as the axis or axle and the larger wheel as the wheel. Around the wheel ran an endless rope which was pulled by the tenant in raising or lowering the elevator.

The down-haul rope was at the right of the entrance to the elevator shaft; the up-haul rope was on the left. The elevator was suspended to a rope that ran around the small wheel or axis, the weight of the elevator being balanced by a counterpoise. The elevator was attached to the rope by a hook-bolt which ran through the head of the car and was fastened underneath by a nut or bur.

Mrs. Timlan testified that on March 18th, 1906, she went to the elevator door and opened it for the purpose of using

the elevator; that from not seeing the rope that suspended the elevator she knew the elevator was at the top of the shaft; that she had a pail of ashes in her left hand, and put out her right hand to draw down the elevator, when it gave way and came down upon her head; that the force of the rope dragged her into the shaft; that the rope went from her and dragged her body in.

It is argued that the nonsuit should have been granted because it is a physical impossibility that the accident happened in the manner described, and that she must have been guilty of contributory negligence in unnecessarily putting her head inside the elevator shaft. With this we are unable to agree. When the nut or bur came off the bolt, allowing the car to fall, the counterpoise weight was released and went down with a run; there was evidence to the effect that this would occasion friction of the rope on the small wheel, and the resulting rotation would lift up the rope of which Mrs. Timlan had hold. As the rope in its normal position was at least the thickness of the jamb (eight inches) away from her perpendicular, and as she had necessarily drawn the rope in towards her in the act of pulling down upon it, the sudden reverse motion would do (or might reasonably be found to have done) just what she said it did, namely, "The rope went from me and dragged my body right in." It was further urged that the motions to nonsuit and direct a verdict should have been granted on the ground that the dumb-waiter was a part of the realty and there was no proof that defendant retained it in his possession or had control of it.

We think it clear that the dumb-waiter was one of the common facilities retained by the landlord, who thereby was charged with the exercise of reasonable care concerning its condition, under the rule laid down by the Court of Errors and Appeals in *Siggins* v. *McGill,* 43 *Vroom* 263.

We are unable to discover evidence (much less conclusive evidence) of Mrs. Timlan's contributory negligence in the circumstances under which the accident occurred.

Nor do we see any conclusive evidence that her husband

had knowledge of any defective condition of the nut and bolt.
Nor does it seem to us that if he had such knowledge it would
be imputed to his wife under the decision in *Goodenough* v.
*Pennsylvania Railroad Co.*, 26 *Vroom* 577.

A question of more nicety is raised from the fact that the
defendant had owned the premises only a short time. He took
title on March 14th, and the accident happened on the 18th.
It appears, however, that he commenced negotiations for its
purchase early in February, and on the 8th of that month
examined the premises in a general way, and a few days later
examined them more particularly in company with a Mr.
O'Connor, and found that the dumb-waiter worked per-
fectly. On March 12th he again examined the premises, in-
cluding the dumb-waiter.

It was reasonable, however, for the jury to infer that he
took no more notice of the elevator than to ascertain whether
it could be operated, complaint having been made that it
worked stiffly, and that with respect to the safety of the ele-
vator he relied altogether upon the mechanic who had the
matter in charge. It appears that one Kellett had overhauled
the dumb-waiters in April, 1905, about a year before the acci-
dent. He says that he screwed up the nut on this bolt and
upset the bolt—that is, battered the head of it so as to cover
the bur—leaving the elevator in a safe condition. An in-
spection of the nut and bur shows clearly that this work of
Kellett was done in a very careless manner. After the acci-
dent the nut was found in the bottom of the elevator, where
it had fallen from the bolt; it was applied to the bolt and
found to fit loosely with one bright thread on both bolt and
nut, and the other threads seemed rusty and as if out of use,
and it was reasonable for the jury to infer that any careful
inspection of the nut by the person charged with its inspec-
tion would have disclosed its unsafe condition. We think the
jury could reasonably find that the proper care that the land-
lord should exercise when assuming control of a mechanism
of this sort was not fulfilled without some more careful in-
spection than the defendant had exercised. If he had testi-
fied that he assumed that it was safe because he had had no

notice to the contrary a different question might have been presented. But he undertook to inspect, and the jury might fairly infer that he inspected so carelessly that he overlooked that which a reasonably careful inspection would have disclosed.

It is further urged for reversal that the trial judge erred in charging the jury that they might allow Mr. Timlan compensation for his loss of the comfort and society and services which he was entitled to have rendered by his wife, as wives ordinarily render them to their husbands. It is not contended that there was any error of law in the proposition thus stated to the jury, except for the fact, as alleged, that the declaration did not in terms cover this element of damage, the words of the declaration being in that respect that "he, the plaintiff, has lost the services of his said wife for a long period of time, &c., and will for a long time hereafter lose the same," &c. As to whether the words of the declaration are in fact sufficient to sustain this part of the charge it is not necessary to determine, for the reason that we do not think this question is presented by the record. *First,* because the exception as taken is multifarious and therefore inefficient. It includes several distinct matters, without pointing out to the court the precise question intended to be complained of. Such an exception has been held nugatory by the Court of Errors and Appeals in *Associates, &c.,* v. *Davison,* 5 *Dutcher* 415–417, and in subsequent cases. *Secondly,* because there is nothing in the exception taken by the defendant to suggest as a ground of exception that the items of damage alluded to were not covered by the declaration, so we are entitled to take it from what the judge said, that this item of damage was a part of the claim of the plaintiff that was litigated at the trial and the declaration would be amendable, if necessary, for the purpose of supporting the judgment. It is also probable that if the attention of the learned trial judge had been called to this ground of exception he would have either corrected his charge accordingly or allowed an amendment of the declaration in the particular mentioned. It is too late now for the defend-

ant to avail himself of the objection to the charge complained of. We have looked at the other assignments of error, but finding no substance in them the result is that the judgment below must be affirmed.